**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | | |
|---|---|---|
| **RAMON YOUNG,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **vs.** | : | **5:09-CV-84 (CAR)** |
| | : | |
| **FEDEX EXPRESS,** | : | |
| | : | |
| **Defendant.** | : | |
| _____ | : | |

*ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*

Defendant fired Plaintiff, an African-American, based on the company's zero-tolerance policy for falsification of delivery records. Defendant investigated a customer complaint and discovered that Plaintiff had falsified seventeen delivery records in a single workday. Plaintiff filed suit alleging that Defendant terminated him because of his race and violated 42 U.S.C. § 2000e *et seq* ("Title VII"), and 42 U.S.C. § 1981 ("Section 1981"). Defendant has moved for Summary Judgment [Doc. 35]. Plaintiff filed a Response [Doc. 41], and Defendant replied [Doc. 48]. As a matter of law, Plaintiff has not shown that Defendant treated him any differently than a similarly situated employee of another race. Defendant's Motion for Summary Judgment is **GRANTED**.

The Court has also considered Plaintiff's Motion [Doc. 43] to incorporate in his Response elements from the record in Henderson v. FedEx (5:09-CV-85). The Court previously denied joinder of the two cases [See Henderson Docs. 32, 36]. Having already reviewed the entire record before granting summary judgment as to all claims in Henderson [Doc. 53], the Court is quite familiar with those facts. To the extent any facts therein are even relevant to this case, nothing in that record helps Plaintiff survive summary judgment. As such, Plaintiff's Motion is **GRANTED**.

**BACKGROUND**

Defendant Federal Express ("FedEx") fired Plaintiff Ramon Young from his job at its Macon Station facility on June 17, 2005. Three days earlier, a customer had complained about a package sent to a recipient on Plaintiff's delivery route. Defendant investigated and discovered that Plaintiff had mishandled the package along with at least sixteen others that day. Plaintiff had also concealed these improper deliveries by misrepresenting the delivery records for each package. FedEx has a zero-tolerance policy on falsification that applies to all company documents. This policy makes any single act of falsification a fatal offense at the company. Plaintiff alleges that Defendant terminated him not for falsifying delivery records but because of his race. The undisputed record shows, however, that Plaintiff cannot make out a prima facie case for race discrimination. Nor can Plaintiff show, as a matter of law, that Defendant's reason for firing him was pretextual.

I. Incident: Plaintiff's act of falsification.

On June 14, 2005, a customer called FedEx to complain about a delivery on Plaintiff's route. (Deposition of Ramon Young, taken May 20, 2008 ("Young Dep."), pp. 147-49; Deposition of Bryan Evans, taken July 10, 2008 ("Evans Dep."), pp. 46-48; Deposition of Susan Sweat, taken July 9, 2008 ("Sweat Dep."), pp. 107-08; Evans Dec. at ¶ 4, Ex. 1; Declaration of Russell Fritts, dated September 10, 2009 ("Fritts Dec."), at ¶ 5, Ex. 1). The recipient had called the sender because the recipient could not initially locate the package. (Id.). The recipient later found the package in an unlocked car on the premises. (Id.) Defendant determined that the recipient had been home at the time Plaintiff left the package. (Id.). Plaintiff admits that he electronically released and left the package in the car. (Young Dep. at pp. 143-45, Ex. 25; Evans

Dep. at pp. 47-49; Sweat Dep. at p. 108; Declaration of Bryan Evans, dated September 11, 2009 ("Evans Dec."), ¶¶ 4-5, Ex. 1-2).

Plaintiff explained to his supervisors that five years earlier the same recipient had permitted him by phone to leave a package in a similarly parked car at the home. (Young Dep. at pp. 148-50; Evans Dep. at p. 54; Sweat Dep. at p. 130). Plaintiff believes that since the recipient authorized him to leave the earlier package in a car on the premises, the recipient would approve if he released any future packages in this manner. (Id.). The recipient specifically denied having authorized Plaintiff to leave the June 13 package either in the unsecured car or without first obtaining a signature. (Evans Dep. at pp. 49-52, 56-60, 121-23, Ex. 1; Sweat Dep. at pp. 130-31).

Plaintiff not only failed to have the recipient sign for the package, but he also recorded in his personal electronic tracking device that he had released custody of the package based on the recipient's signed authorization. (Young Dep. at pp. 144-46, Ex. 25; Evans Dep. at p. 102; Sweat Dep. at p. 109-12, 114; Evans Dec. at ¶ 5, Ex. 2; Declaration of Michael S. Britton, dated September 11, 2009 ("Britton Dec."), ¶ 7). Such prior authorization, if properly obtained, would have allowed him to release the package at the residence without having the recipient sign for the package at the time of delivery. (Id.). The recipient could have authorized Plaintiff to release the package without a signature either by signing a door tag left by Plaintiff on a previous delivery attempt or by signing a general authorization form in advance. Plaintiff admits he had left no door tag for the recipient to sign and that the recipient had not signed a general authorization form. (Young Dep. at pp. 149-50; Sweat Dep. at pp. 105-07, 109-11; Evans Dec. at ¶¶ 4, 6-7, Ex. 1, 3-4; Britton Dec. at ¶ 7).

II. Policies: Defendant's policy on falsification and requirements for signature release.

Just months before this incident on February 4, 2005, management held a meeting that Plaintiff attended. (Young Dep. at pp. 109-11, 122, 124, 128-29, 163, 165, Ex. 18, 20, 30-31; Evans Dep. at pp. 30-33, 37, 99, 105, Ex. 5, 11; Sweat Dep. at pp. 102-05, 115, 133, 152-53, Ex. 5; Deposition of Monty Connell, taken July 10, 2008 ("Connell Dep."), p. 33, Ex. 11; Evans Dec. at ¶ 9, Ex. 6; Britton Dec.at ¶¶ 9-10 Ex. 1-2; Fritts Dec. at ¶ 6). At the meeting, management warned all Macon employees that FedEx had revised its Acceptable Conduct Policy to make deliberate falsification of company records a terminable offense. (Id.). Management also reviewed FedEx's Signature Release Policy with its employees and warned them that failure to follow the authorized release methods described in that policy could be considered deliberate falsification of FedEx delivery records. (Young Dep. at pp. 109-11, 118, 120-22, 124, 129, 163, 165, Ex. 18-20, 30-31; Evans Dep. at pp. 24-25, 37-39, 99, 105, Ex. 5, 11; Sweat Dep. at pp. 105-07, 113-15, 152-53, Ex. 5; Connell Dep. at p. 33, Ex. 11; Deposition of Mike Britton, taken July 10, 2008 ("Britton Dep."), pp. 29-30; Britton Dec. at ¶¶ 9-10, Ex. 1-2; Fritts Dec. at ¶ 6). Plaintiff additionally received the following signed memorandum at the meeting from the Senior Manager of the Macon Station:

> "[I]ssues have surfaced surrounding improper use of the signature release policy . . . .
> The Company recently began taking a more decisive position regarding ANY falsification issue. This includes falsification of any paper or electronic (tracker) information. Falsification can be defined as reporting anything that you know or should know is not totally factual.
> Effective immediately, if after an investigation is conducted, it is determined that an employee failed to follow authorized release methods per the Signature Release Policy, or has falsified any other document, those employees will be terminated. I cannot overstate the absolute necessity for all of us to adhere to the applicable policies.
> . . . We will continue to provide the high quality service that our customers expect from us. However, we will do it the right way. You should

rethink your position if you feel you need to falsify anything in order to get your job done. Quite simply, I do not want anyone to lose their job because the expectations against any form of falsification were unclear.

. . . Ask one of your managers or ask me if you have any questions. Starting immediately, everyone will be held responsible for using proper release procedures and for adhering to acceptable conduct with respect to any falsification issue.

Your signature below indicates that you have received, read, and have had the opportunity to discuss the contents of this packet with your manager . . . ."

(Young Dep. at pp. 109-11, Ex. 18; Evans Dep. at pp. 30-31, 99, 105, Ex. 5, 11; Britton

Dep. at pp. 22, 29-30; Sweat Dep. at pp. 152-53, Ex. 5; Connell Dep. at p. 33, Ex. 11;

Britton Dec. at ¶ 3, 9-10, Ex. 1-2). Plaintiff signed and returned the memo to Defendant.

FedEx managers Bryan Evans and Russell Fritts specifically warned all Macon couriers

that when no one was available to accept a package, a courier could not disregard the Signature

Release Policy and leave the package simply to avoid making another delivery attempt. (Young

Dep. at p. 122; Evans Dec. at ¶ 3; Fritts Dec. at ¶¶ 3, 6, Ex. 2). The Signature Release Policy,

they explained, only allowed couriers to leave a package if FedEx had received documented

approval from the customer to release the package. (Young Dep. at pp. 118, 129, Ex. 19; Sweat

Dep. at pp. 105-07, 113-14). Finally, Plaintiff's managers told him individually that in order to

satisfy the policy, he could obtain signature release authorizations in advance from the customers

on his route, which the company would keep on file at the Macon Station. (Young Dep. at pp.

114-16, 129; Evans Dep. at pp. 24-25; Sweat Dep. at p. 106).

Plaintiff began working for FedEx in 1990 as a cargo handler. (Young Dep. at pp. 36-37,

193-94, Ex. 5, 38; Evans Dep. at p. 16). Defendant promoted Plaintiff just a year later to the

position of courier, and from 1993 until he was fired he worked as a courier out of Defendant's

facility in Macon, Georgia. (Young Dep. at pp. 37-38, Ex. 5). During this time, he received and

referenced FedEx's Employee Handbook, People Manual, and Acceptable Conduct Policy,

which together outline all of the company policies discussed above. (Young Dep. at pp. 29-33, 73-75, 81-82, 84, 109-111, 128, Ex. 2-3, 6-7, 9, 18, 20).

Plaintiff admits to all of the above facts on FedEx's falsification and signature release policies. He further acknowledges that at no point had anyone in FedEx management ever told him that these policies did not apply to him. (Young Dep. at p. 126, ll. 21-23; Evans Dep. at pp. 33, 37-39, 68-69; Evans Dec. at ¶ 9, Ex. 6; Britton Dec. at ¶¶ 9-10, Ex. 1-2; Fritts Dec. at ¶ 6, Ex. 2). Despite these many warnings and Plaintiff's status as a veteran FedEx courier, Plaintiff attempts to justify his misconduct by suggesting that he was somehow excepted from these policies because his rural route covered a larger area than that of some of his colleagues. (Young Dep. at pp. 121-22, 127). He has offered no credible evidence in support of this claim.

III. Investigation: Defendant's findings regarding Plaintiff's delivery methods.

As Manager Evans investigated the June 14 customer complaint, he learned that Plaintiff had repeatedly failed to obtain signatures–or any authorized substitute–before he released packages on his route. (Young Dep. at p. 149; Evans Dep. at pp. 49-52, 56-60, 121-23, Ex. 1; Sweat Dep. at pp. 105-07, 109-13, 130-31, 167; Evans Dec. at ¶¶ 3-7, Ex. 1-4; Britton Dec. at ¶ 7). In addition to the complained of package, Plaintiff had also violated the Signature Release Policy for sixteen other packages that day. (Id.). Management had not detected this misconduct previously because Plaintiff made electronic entries into his personal handheld tracking device that indicated the recipients had signed for their packages when, in fact, they had not done so. (Young Dep. at pp. 135-36, 144-46, 150-55, Ex. 25-26; Sweat Dep. at pp. 116-21, 131-32; Evans Dec. at ¶¶ 4, 6, 8, Ex. 1, 3, 5; Britton Dec. at ¶¶ 7, 10, Ex. 2). Since none of these recipients had authorized Plaintiff to release their packages without a signature, each of the seventeen entries

constituted a separate act of falsification of FedEx delivery records. (Id.).

Evans and his Senior Manager, Mike Britton, concluded that Plaintiff had ignored the Signature Release Policy at least seventeen times on June 14. (Evans Dep. at pp. 46-60, 121-23, Ex. 1; Britton Dep. at pp. 22, 29-30; Sweat Dep. at pp. 105-12; Evans Dec. at ¶ 4, Ex. 1; Britton Dec. at ¶¶ 3-8). Worse, he also had deliberately falsified FedEx delivery records on all of these deliveries to conceal his misconduct. (Id.). Faced with these facts, FedEx Human Resources and their Managing Director directed Evans and Britton to fire Plaintiff on June 17 for violating FedEx's zero-tolerance policy on falsification. (Young Dep. at pp. 109-11, 118, 124, 129, Ex. 18-19; Evans Dep. at pp. 99, 105, Ex. 5, 11; Britton Dep. at pp. 24-25; Sweat Dep. at pp. 45, 71-73, 102-05, 133, 152-53, Ex. 5; Connell Dep. at p. 33, Ex. 11; Britton Dec. at ¶¶ 5-9, Ex. 1).


IV. Appeal: Plaintiff's appeal of his dismissal for falsification.

Three levels of upper management upheld Plaintiff's termination even though he contested the decision through all steps of FedEx's Guaranteed Fair Treatment ("GFT") Procedure and the EEO Complaint Process. (Young Dep. at pp. 157-61, 163-66, 180-81, 187-88, 191-93, Ex. 28-35, 37; Sweat Dep. at pp. 40, 79-82, 88-96, 115-32, 134-41, 143-47, 177-181, 187-88 Ex. 1, 21-27, 32; Evans Dec. at ¶ 9, Ex. 6; Britton Dec. at ¶10, Ex. 2; Fritts Dec. at ¶ 6, Ex. 2). FedEx Managing Director Susan Sweat handled Step I of Plaintiff's GFT appeal. (Young Dep. at pp. 157-61, Ex. 29-30; Sweat Dep. at pp. 79-82, 86-89, 96-99, 101-02, 105-132, 177). She independently investigated and found no reasonable basis for Plaintiff's subjective conclusion that he was excepted from the company's policies. (Id.). FedEx Vice President Ted Merida conducted Step II of Plaintiff's appeal and, after fully reviewing the case, found Plaintiff's contentions without merit. (Young Dep. at pp. 163-65, Ex. 31). He therefore upheld

the decision to terminate Plaintiff's employment with the company. Id. Plaintiff has never alleged that either Sweat or Merida exhibited any sort of racial bias. (Young Dep. at pp. 85, 87-89, 102-03, 105, Ex. 31 [p. 5-5]).

During the first two stages of the GFT process, Plaintiff did not raise any claims of race discrimination or claim that Defendant had treated other employees differently for the same conduct. (Young Dep. at Ex. 29 (pp. 3-155)). Plaintiff instead argued that his supervisors were to blame for his misconduct, and he first alleged this after Step I of his GFT appeal was well underway. Plaintiff also asserted his belief that Evans had excepted him from the Signature Release Policy. Though Plaintiff did not raise his interpretation of the policy with his direct supervisors initially or even during their investigation, he now cites a satisfactory performance review Evans gave him after conducting a "Check Ride" on his delivery route in April 2005 as evidence he had been excepted. (Young. Dep. at 139-40).

Evans, however, would not have known from what he observed during the "Check Ride" with Plaintiff that Plaintiff did not actually have the signature releases on file at the Macon Station as Plaintiff indicated on his record for several of the deliveries made during the "Check Ride." (Young. Dep. at 131, 135-36; Evans. Dep. at pp. 43-45). Furthermore, Evans explicitly asked Plaintiff that day whether certain customers whose packages were released without a signature had an authorization on file. (Evans. Dep. at p. 40). Plaintiff responded that they did, and Evans reminded him of the strict requirements of the company Signature Release Policy. (Id.). Evans documented this reminder in his report on the "Check Ride," which Plaintiff received, reviewed, and approved shortly thereafter. (Young Dep. at pp. 139-40, Ex. 22 (p. 3-7)).

Company delivery records further confirm that Plaintiff performed fewer unauthorized releases when accompanied by Evans on the day of the "Check Ride" than he normally did on

days when he serviced his route alone. (Sweat Dep. at pp. 116-19, 121). Despite the fact

Plaintiff cut his delivery record falsifications by half in the presence of his supervisor, FedEx

nonetheless reprimanded Evans for failing to discover Plaintiff's misconduct sooner. (Evans

Dep. at pp. 62, 118, Ex. 18; Sweat Dep. at pp. 143-45, 151-52, Ex. 4). Had Evans verified the

signature release records for the route when he returned to the station after the "Check Ride" he

might have discovered Plaintiff's deception that day. (Id.).

Plaintiff failed to achieve reinstatement during the internal GFT appeals process at FedEx

or through the EEO procedure, and he then filed suit in this Court. Title VII and Section 1981

require a prima facie showing that Defendant treated a similarly situated non-black employee

more favorably than Plaintiff. Plaintiff took over a thousand pages of depositions to attempt to

find such an employee. Of the eleven potential comparators raised in response to this Motion,

none portrays a current or former FedEx employee whom Defendant treated differently than

Plaintiff for falsifying a company document. The Court will discuss each potential comparator

in detail, analyzing the facts in the light most favorable to Plaintiff.


**LEGAL STANDARD**


Summary judgment must be granted if "there is no genuine issue as to any material fact

and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see

also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Johnson v. Clifton, 74 F.3d 1087, 1090

(11th Cir. 1996). The substantive law applicable to the case determines which facts are material.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Not all factual disputes render

summary judgment inappropriate; only a genuine issue of material fact will defeat a properly

supported motion for summary judgment. See Id. at 247-48. Thus, summary judgment may be

granted if there is insufficient evidence for a reasonable jury to find for the nonmoving party or, in other words, if reasonable minds could not differ on the verdict. See Id. at 249-52.

In reviewing a motion for summary judgment, the Court must view the evidence and all justifiable inferences in the light most favorable to the nonmoving party, but the Court may not make credibility determinations or weigh the evidence. See id. at 254-55; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).

The movant carries the initial burden and must show the court that "an absence of evidence to support the nonmoving party's case" exists to sustain its motion. Celotex, 477 U.S. at 325. "Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

The nonmoving party must then go beyond the pleadings and present specific evidence that raises a genuine issue of material fact (i.e., evidence that would support jury verdict), or otherwise show that the moving party is not entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(e); see also Celotex, 477 U.S. at 324-26. This evidence must consist of more than conclusory allegations or legal conclusions and may include affidavits, depositions, and admissions. See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991). "Mere conclusions and unsupported factual allegations, as well as affidavits based, in part, upon information and belief, rather than personal knowledge, are insufficient to withstand a motion for summary judgment." Ellis v. England, 432 F.3d 1321, 1327 (11th Cir. 2005). Summary judgment must be entered where "the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof." Celotex, 477 U.S. at 323.

Plaintiff only responded in part to Defendant's Motion for Summary Judgment. To grant

summary judgment, the Court must find that the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Eleventh Circuit has made it clear that a "district court cannot base the entry of summary judgment on the mere fact that the motion was unopposed, but, rather must consider the merits of the motion." United States v. 5800 SW 74th Ave., Miami, Fla., 363 F.3d 1099, 1101 (11th Cir. 2004) (internal citation omitted). But claims not addressed by a plaintiff in response to a motion for summary judgment may be waived on appeal. See Wilkerson v. Grinnell Corp., 270 F.3d 1314, 1322 (11th Cir. 2001); Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995).

Plaintiff's Response relies in part on inadmissible summary judgment evidence. Any document to be considered for or against summary judgment must be authenticated, either by an affidavit that meets the requirements of Federal Rule of Civil Procedure 56(e) or by Federal Rule of Evidence 901(a). But see United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1444 (11th Cir. 1991) (not requiring evidence produced by nonmoving party at summary judgment to be in admissible form as long as it could be reduced to admissible form at trial).

In the employment discrimination context, unverifiable conjecture, unsupported opinions, and unsubstantiated allegations of coworkers cannot suffice as viable summary judgment evidence, especially where contradictory of highly credible and authenticated record evidence. See Bogle v. Orange County Bd. of County Comm'rs, 162 F.3d 653, 658-59 (11th Cir. 1998) (rejecting plaintiff's unverifiable, anecdotal testimony about alleged comparators); Combs v. Plantation Patterns, 106 F.3d 1519, 1532 (11th Cir. 1997) (requiring plaintiff to introduce sufficient testimony to allow fact finder to disbelieve each of employer's proffered explanations

to survive summary judgment). A district court does not need to "review all of the evidentiary materials on file," *sua sponte*, however, it "must ensure that the motion itself is supported by evidentiary materials" and, at the least, "must review all of the evidentiary materials submitted in support of the motion for summary judgment." <u>5800 SW 74th Ave.</u> 363 F.3d at 1101-1102.

## DISCUSSION

<u>I. Race discrimination claim: No similarly situated employee fared better for falsification.</u>

As a matter of law, Plaintiff cannot establish a prima facie case of employment discrimination, because he fails to show any similarly situated employee of another race who received more favorable treatment for falsifying company documents. To establish a prima facie case under Title VII or Section 1981 for disparate treatment stemming from discrimination, Plaintiff must show that:

      (1) he is a member of a protected class;
      (2) he was subject to an adverse employment action;
      (3) his managers treated similarly situated employees who were not members of
          protected class more favorably; and
      (4) he was qualified for the job.

<u>Gillis v. Georgia Dept. of Corr.</u>, 400 F.3d 883, 887 (11th Cir. 2005).

Defendant does not dispute that Plaintiff is black, that he was qualified for his job up until the time he began falsifying company delivery records, and that his dismissal from FedEx qualifies as an adverse employment action. The only issue for the Court to consider, therefore, is whether Plaintiff can demonstrate that similarly situated employees of other races received more favorable treatment than he did under the same circumstances.

The Eleventh Circuit has set a high standard that "require[s] that the quality and quantity of the comparator's misconduct be nearly identical to prevent courts from second-guessing

employers' reasonable decisions and confusing apples with oranges." <u>Maniccia v. Brown</u>, 171 F.3d 1364, 1368 (11th Cir. 1999). To demonstrate disparate treatment with regard to his discharge for falsification, Plaintiff would need to show that he is similarly situated to a non-black employee in nearly identical respects. <u>See</u> <u>Silvera v. Orange County Sch. Bd.</u>, 244 F.3d 1253, 1259 (11th Cir. 2001). The same decision-makers must be involved and the circumstances must be of the same nature. <u>Id.</u>

Plaintiff has offered eleven potential comparators. None is similarly situated. Defendant actually fired four for their misconduct. Four more simply made an honest mistake so are not similarly situated. And three others did not even violate company policy so cannot possibly function as comparators to Plaintiff.

The first group of terminated employees includes Cathy Harris, Mike King, Tyrone Tanner, and Lisa Crowder. Harris and King did not cover up their failure to complete certain deliveries; rather, they improperly used the "incorrect address" exception code to commemorate these failures. FedEx disciplined and ultimately dismissed them after they had demonstrated an ongoing inability to break their habit of misusing the code to avoid making routine deliveries. FedEx dismissed Tanner for the exact same infraction as Plaintiff. The company reinstated him, however, after he showed that he could not have intended to falsify the record in question. A damaged air bill had made the signature requirement impossible to ascertain. Crowder was terminated for repeated tardiness. FedEx does not dispute that the company could also have fired her for time card falsification.

The second group of potential comparators includes Thomas Dudley, Greg Dumas, Matt Riggins, and Phil Stefano. None exhibited an intent to falsify company records. Dudley thought the "incorrect address" exception code applied to a delivery situation he faced even though it did

not, so he made a mistake by using the code but did not intend to falsify a company record. Dumas incorrectly entered a "security delay" exception code but had no intent to falsify delivery records since he thought the code applied when a courthouse security checkpoint delayed a delivery. Plaintiff claims that courier Riggins delivered radioactive materials without the proper safety credentials. Without any credible record evidence in support of this allegation, Plaintiff further infers that Riggins must have falsified his certification documents. Stefano accidentally delivered a package to the wrong address and released it without a signature, but the recipient at that address did, in fact, have a signature release authorization on file. Thus, any misconduct arose out of the misdelivery, not from the resulting error in the signature release record.

The third group of three potential comparators includes Tim Alexander, Kimberly Davis, and Russ Fritts. All three acted appropriately in carrying out their respective duties. Alexander correctly used the "package undeliverable" exception code when he found the delivery location at a busy military loading dock already occupied. FedEx investigated Davis for events surrounding Lisa Crowder's repeated tardiness, discussed *supra*. Davis entered employee time cards as part of her job responsibilities, and although she entered a time card Crowder had altered, there is no evidence that she knew of this falsification or was complicit in it. Fritts, a manager, implemented a new company-wide sorting policy. His actions in carrying out a company directive do not constitute an act of falsification even if, as Plaintiff suggests without pointing to any concrete evidence, the new policy could have made certain record statistics appear rosier than they did before the change.

The Court will now analyze each of these eleven alleged comparators in greater detail. Even viewing the facts of all eleven in the light most favorable to Plaintiff, none are similarly situated as a matter of law. Thus, Plaintiff cannot make out a prima facie case under Title VII or Section 1981, and summary judgment in favor of Defendant is required.

a. Cathy Harris and Mike King

Cathy Harris and Mike King are not similarly situated to Plaintiff because they engaged in different conduct and exhibited a different level of intent. FedEx ultimately fired both white employees after initially issuing disciplinary letters to them for improperly using the "incorrect address" code. A spike in similar entries by the pair led the company to investigate their work habits. (Evans Dep. at pp. 70, 75; Britton Dec. at ¶ 15, Ex. 8). FedEx concluded that more diligent efforts would have led them to find the correct addresses on their initial delivery attempts. (Id.). Defendant thereafter dismissed both for their lax work habits. (Id.). Neither Harris nor King, therefore, received better treatment than Plaintiff since all three were fired.

Regardless, the fact situations are not sufficiently similar. Harris and King misused an exception code to avoid making deliveries but demonstrated no intent to falsify; Plaintiff intentionally falsified his delivery records to conceal the very fact of his misconduct after he had already released each package wrongfully. The conduct of an employee who fails to locate an address and retains a package–albeit through a lack of effort–differs from that of one who deliberately releases a package without authorization and then intentionally falsifies company records to cover up the improper delivery. In the former situation, FedEx retains an opportunity to correct the mistake and send the package out again to be delivered properly. In the latter scenario, however, the company loses all control over the delivery. This leaves the package vulnerable to theft, damage, or loss and places FedEx's reputation and credibility at risk even as the company remains completely unawares.

Similarly situated black employees did, in fact, receive discipline short of termination for carelessly using the incorrect address exception code. The same managers who fired Plaintiff reprimanded at least two black couriers who misused the incorrect address code but demonstrated no intent to falsify delivery records. Specifically, Evans disciplined but did not

15

fire black couriers Cliff Fluellen and Juan Johnson for applying an exception code where it appeared that each had failed to deliver a particular package due to a lack of effort in locating the correct address rather than a genuine delivery exception. (Britton Dec. at ¶ 15, Ex. 9).

The essence of Defendant's business depends on prompt and precise delivery systems. The only way for Defendant to build and preserve a reputation for dependability is by ensuring strict employee fidelity to these systems. This Court will not second-guess the wisdom of employment decisions at a business or the relative importance of different corporate rules to the company's mission. See Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1361 (11th Cir. 1999); Jones v. Bessemer Carraway Med. Ctr., 137 F.3d 1306, 1311-12, modified on other grounds, 151 F.3d 132 (11th Cir. 1998).

Defendant, moreover, can best assess what types of misconduct most affect its brand and allocate punishments accordingly. The Court determines only whether Defendant has applied these policies in a discriminatory manner. Defendant believes negligent delivery mistakes do not threaten its core business image as much as deliberate acts of falsification and thereby metes out a more severe punishment for the latter. Since Defendant has drawn a reasonable distinction among two different types of misconduct and applied the policies uniformly to black and white couriers, Harris and King cannot function as comparators to Plaintiff.

b. Tyrone Tanner

Plaintiff attempts to demonstrate that Defendant treated white courier Tyrone Tanner differently than Plaintiff after the company fired Tanner for falsification. In November 2005 Tyrone Tanner delivered a package and entered the "signature release" code even though he had failed to obtain the recipient's signature. (Britton Dec. at ¶ 20, Ex. 10). After an investigation, Defendant fired Tanner pursuant to the zero-tolerance falsification policy. (Id. at ¶ 12). Thus,

16

the company treated him the same as Plaintiff was treated for a similar violation. At this point, however, the two fact situations diverge.

During the internal appeals process, Tanner presented compelling evidence that damage to the package's air bill had prevented it from scanning properly to reveal the "signature release" requirement. (Id.). Tanner had only entered the "signature release" code based on flawed information. (Id.). To the best of Tanner's knowledge, that particular delivery required no signature, because the damaged bar code caused a scanning malfunction, which effectively hid the signature requirement from him. (Id.). In light of this newly discovered information, FedEx reinstated Tanner since the evidence proved he did not have the requisite intent to falsify the record in question. (Id.). By contrast, Plaintiff does not dispute that he purposefully falsified company records by releasing packages based on signature authorizations he knew did not exist.

When FedEx thought Tanner had similarly falsified a company delivery record just one time, the company took immediate action to terminate his employment. Plaintiff has made no showing that Defendant would not also have reversed the decision to fire him had evidence surfaced to disprove his intent to falsify the many delivery records at issue. Defendant's correction of a decision to dismiss an employee that turned out to have been based on a false premise does not qualify as disparate treatment.


### c. Kimberly Davis and Lisa Crowder

FedEx fired Kimberly Davis, who is white, for repeated tardiness. Since she received the same punishment as Plaintiff, Plaintiff can make no showing of disparate treatment. On October 24, 2005, Davis, who was running late to her job as a customer service agent in FedEx's Macon Station, called co-worker Lisa Crowder and asked Crowder "to cover" for her since she had already received multiple warnings from management regarding her punctuality. (Connell Dep.

at pp. 18-22). As it was her job to do, Crowder later "keyed in" Davis's time card information, which Davis had falsified to reflect a start time earlier than her actual arrival. (Id.). FedEx manager, Monty Connell, who took no part in the investigation or termination of Plaintiff, fired Davis for her misconduct. (Id.).

Plaintiff argues that Davis received more favorable treatment than him, because the reason stated in her file for her termination was her failure to meet FedEx's punctuality standard–not falsification. It is undisputed, however, that this was Davis's third reprimand for tardiness. FedEx policy required termination under these circumstances because these three violations occurred within the same twelve-month period. FedEx does not dispute that the company could alternatively have fired Davis for falsification. Choosing among two available punishments does not, in itself, imply discrimination. See Jones 137 F.3d 1306 at 1311-12. In any case, termination for tardiness was not an available punishment for Plaintiff's misconduct, so he and Davis are not similarly situated.

Plaintiff contends that termination for tardiness will hurt Davis's future employment prospects less than Plaintiff's dismissal for falsification. The undisputed record, however, shows that FedEx does not disclose the reason for a former employee's separation from the company to potential future employers seeking such information. (Declaration of Betty J. Saylors, dated November 24, 2009, ¶ 5, Ex. 1). In fact, FedEx policy allows only the release of minimal information, such as verification of employment, to any outside source. (Id.).

Plaintiff also asserts that his treatment should be compared to that of Lisa Crowder, who is also white and remained at FedEx after the incident with Davis. Unlike Plaintiff, however, the record does not indicate that Crowder falsified any company document. Although she entered the time card information that Davis had falsified, it was her job to do so. There is no credible evidence in the record that she had either the knowledge or intent to help Davis falsify her time

card.  Even if she knew the time on Davis's card was incorrect, it is undisputed that management has the responsibility for auditing time card information.  Crowder, for instance, could reasonably have believed that management had consented to the earlier start time reflected on Davis's time card.  Or she may not have noticed the discrepancy at all since her job required only data entry–not qualitative analysis.  Without any evidence that Crowder was complicit in Davis's deception, Crowder cannot function as a comparator in this case.

Regardless of her intent, Crowder is not similarly situated to Plaintiff.  She held a different position with very different job responsibilities; she was disciplined by a different supervisor; and the misconduct was of a different quality.  See Maniccia 171 F.3d 1364 at 1368 (requiring that "the quality and quantity of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges").  Keying in someone else's time card among many others as part of a business routine is very different from actively disregarding company delivery policies.

A well-documented internal investigation uncovered Plaintiff's scheme to release many packages over time without obtaining the proper authorization and to conceal his misconduct by repeatedly falsifying delivery records.  There is no record evidence of any intent on Crowder's part to falsify a company document, so it was reasonable and expected for FedEx management to conclude not to terminate her for falsifying company documents.  Neither Crowder nor Davis therefore properly function as comparators in Plaintiff's case.


d. Thomas Dudley

White courier Thomas Dudley's act of misconduct, as alleged by Plaintiff, is not supported by competent record evidence and, in any case, is not comparable to Plaintiff's misconduct.  The record evidence proffered by Plaintiff on Dudley derives solely from hearsay

contained in an unsigned copy of an EEOC memorandum, which cites no primary sources and

has patent factual errors. (Young Dec. at Ex. 30). Such unsupported lay conclusions are not

entitled to any legal deference. Regardless, the facts do not show that Dudley intentionally

falsified delivery records but only that he incorrectly designated a package that ended up on his

truck as a result of a sorting error at the station.

A district court may properly exclude EEOC reports that contain only legal conclusions

or raise questions of trustworthiness. See Barfield v. Orange County, 911 F.2d 644, 650 (11th

Cir. 1990). Even an admissible EEOC report or determination may be "suitable for framing, but

does not create an issue of fact." Williams v. Alabama Indus. Dev. Training, 146 F. Supp. 2d

1214, 1224 (M.D. Ala. 2001). The Court "is not required to defer or make reference to the

EEOC determination in its opinion deciding summary judgment and, therefore, is not required to

find the determination creates an issue of material fact." Keaton v. Cobb County, 545 F. Supp.

2d 1275, 1310-11 (N.D. Ga. 2007) (internal citation omitted). "It is the Court's, not the EEOC

investigator's, duty to determine whether issues of material fact exist." Id. at 1311 (internal

citation omitted). Moreover, an EEOC memorandum or determination will not defeat summary

judgment where the findings and determination are unsupported by summary judgment

evidence. See, e.g., Alexander v. Baldwin County Bd. of Educ., No. 07-0333-CB-C, 2008 WL

3551194, at *8 n.14 (S.D. Ala. Aug. 12, 2008) (EEOC determination did not create inference of

pretext when conclusions not supported by summary judgment evidence).

Regardless of its admissibility, the unverifiable and conclusory nature of this report

drains it of much, if not all, of its remaining probative value as evidence. See Lee v. Executive

Airlines, Inc., 31 F. Supp. 2d 1355, 1357 (S.D. Fla. 1998) (excluding EEOC letter for lack of

probative value where it did not outline, even summarily, evidence relied upon for its conclusion

that reasonable cause existed for belief that violation occurred); Hodge v. Superior Court, No.

07-87, 2009 WL 333-4594, *7 (D.V.I. Oct. 14, 2009) (concluding that EEOC "finding that there is reason to believe a violation has occurred," which "does not detail any factual findings of the EEOC's investigation" but instead "only refers generally to 'the evidence'" without citing source of evidence is, in fact, "no evidence at all").  Additionally, recognizing that EEOC reports are not homogenous products and that they vary greatly in quality and factual detail, the Eleventh Circuit has held that, even when admitted, these documents are not to be used to adjudicate the rights and liabilities of the parties. See Goldsmith v. Bagby Elevator Co., 513 F.3d 1261, 1288-89 (11th Cir. 2008).

Plaintiff had at least two years to conduct his own full investigation of the case after he filed it.  This period included the normal six-month discovery period, in addition to an extension granted by the Court at Plaintiff's request.  An unsigned EEOC memorandum does not substitute for affidavits or depositions taken under oath.

Dudley cannot function as a comparator in this case even if the Court accepts the facts as presented by Plaintiff through the EEOC memorandum.  The memo indicates that in April 2003 Dudley entered the "incorrect address" exception code into his personal electronic tracking device. (Evans Dep. at pp. 102-04; Britton Dec. at ¶ 15, Ex. 8).  This code is properly entered when the sender has incorrectly addressed it. (Id.).  In this case, however, the address was correct but did not exist on Dudley's route. (Id.).  The package had only ended up on Dudley's truck as a result of a sorting mistake at the station. (Id.).  While the code Dudley entered thus turned out to be technically misapplied to the package, no record evidence suggests that he intended to falsify the delivery record or that he had any prior knowledge that the code did not apply in that situation. (Id.).  Rather, management concluded that Dudley truly misunderstood the proper use for the "incorrect address" code. (Id.).  FedEx nonetheless disciplined him by requiring him to attend a work counseling session. (Id.).

Plaintiff, on the other hand, knew the proper use for the "signature release" code but apparently decided its requirements did not apply to him. Moreover, he repeatedly ignored Defendant's admonitions to use the code correctly. He did so despite clear warnings from several different sources on the consequences for falsifying records. The zero-tolerance policy was announced and discussed in conjunction with the signature release policy at a meeting of all employees on February 4, 2005.

After that meeting, management sent a memo to all in attendance that bluntly concluded, "You should rethink your position if you feel you need to falsify anything in order to get your job done." (Young Dep. at pp. 109-11, Ex. 18.). The memo also plainly stated that anyone who falsified a company document would be terminated. This explicitly included electronically misrepresenting signature release entries. Finally, the memo encouraged employees to have management clarify any confusing aspect of the policy changes. Plaintiff signed the memo, and thereby acknowledged that he had received, read, and resolved any misunderstanding of the policy.

Supervisors Evans and Fritts reiterated these points during a meeting with all couriers shortly thereafter. Evans reminded Plaintiff one-on-one during the "Check Ride" of the importance of the policy and fatal employment consequences for disregarding it. Finally, Plaintiff received, reviewed, and referenced employee handbooks and other company materials that outlined the falsification and signature release policies.

In addition to these various forms of notice by Defendant to Plaintiff regarding the policies, the record evidence suggests that Plaintiff knew his delivery methods and record-keeping ran afoul of company policy. For instance, he committed half the number of signature release infractions when his supervisor was present on his route to observe his deliveries than he had on other days. Whatever motivated him on the "Check Ride," Plaintiff deliberately and

repeatedly chose not to engage in appropriate delivery practices. He continually failed to obtain prior authorization for the proper release of packages–at least once when the recipient was actually present at the delivery location. Then, Plaintiff intentionally falsified delivery records to conceal these faulty release methods, and he did so with the full knowledge that company policy required management to fire any employee who falsified company documents.

By contrast, nothing in the record indicates that Dudley concealed his mistake after he misapplied a code to the parcel cited by Plaintiff. Because of a sorting error outside Dudley's control, he could not physically deliver this package, so he entered the exception code he felt best reflected his inability to locate the address on his route. The electronic system requires a courier to enter an exception code whenever a delivery cannot be completed. As such, Dudley made an honest attempt to enter the code that appeared most applicable to the situation he faced. Plaintiff, on the other hand, actively and continually disregarded company policies in entering exception codes he knew were false. Despite Dudley's good faith, Defendant still reprimanded him for his mistake, which in itself indicates how serious the company takes this issue. Since there was no evidence that Dudley intentionally falsified delivery records, however, the company could not have fired Dudley on these grounds for his mistake.

Even if the Court could construe Dudley's entry of an incorrect code as an intentional act of falsification, the Dudley incident took place two years before FedEx implemented the zero-tolerance policy on falsification. At the time Dudley mistakenly entered the wrong code into his tracking device in 2003, a deliberate act of falsification did not require automatic termination. Therefore, Dudley cannot function as an appropriate comparator to Plaintiff, since the company could have dealt with similar infractions in an entirely different manner before the zero-tolerance policy took effect in 2005, such as by reprimanding an employee with counseling.

e. Greg Dumas

A white courier named Greg Dumas entered the "security delay" exception code on July 13, 2005, because a line had formed at the security screening station leading into a courthouse where he needed to deliver a package. A FedEx investigation confirmed that several other couriers had told Dumas to enter this code when faced with a potential security delay. (Britton Dec. at ¶ 18). Manager Britton concluded that Dumas and the other couriers had a reasonable misunderstanding of the proper use of the code, and he subsequently made them aware that the "security delay" code should not be used in this situation. (Id.).

Plaintiff asserts that he similarly "misunderstood" Defendant's falsification policy. The record evidence shows, however, that Plaintiff could not reasonably have misunderstood the policy. Unlike Dumas, Plaintiff admits that no other courier or FedEx employer misled him to think that the "signature release" exception code was appropriate when he entered it. (Young Dep. at p. 126, ll. 21-23). Instead, he adopted this practice all on his own. Defendant also informed Plaintiff several times in several settings of the consequences of falsifying delivery records in precisely this manner (As previously discussed, this notice came at the initial meeting to explain the falsification policy change, through the memo from management, with the distribution of company handbooks that Plaintiff admits he read, and during the Check Ride with his supervisor.). On February 4, 2005, Plaintiff signed an acknowledgment that he had received, read, understood, and resolved any outstanding issues regarding the falsification policy as it applied to signature release requirements.

Finally, Dumas only delayed the eventual proper delivery of one package. In other words, he did not enter an incorrect exception code as a means for making an improper delivery. Plaintiff, on the other hand, habitually released packages that should never have been released without a signature and falsified corresponding delivery records to conceal this misconduct. In

doing so, he jeopardized the contents of the package and his company's reputation.

The record reflects that Dumas's sole lapse of entering an incorrect exception code occurred as part of a good faith effort to follow FedEx policy as he understood it at the time. As such, he had no intent to falsify and cannot function as a proper comparator in this case. Plaintiff deliberately and repeatedly falsified company records despite having had advance notice both of the strict signature release and zero-tolerance falsification policies. Thus, Dumas is not similarly situated to Plaintiff.

### f. Matt Riggins

Based only on the unverifiable conjecture, unsupported opinions, and unsubstantiated allegations of coworkers, Plaintiff attempts to show that white courier Matt Riggins was not certified to transport radioactive materials. If true, these actions would violate company safety policies. This type of misconduct, however, would not require an act of falsification, and as such, it would not necessarily result in termination. Without pointing to any credible record evidence in support of these claims, Plaintiff cannot create a genuine issue of material fact in this manner, which is tantamount to manufacturing a comparator out of sheer supposition. See Bogle 162 F.3d at 658-59 (rejecting plaintiff's unverifiable, anecdotal testimony about alleged comparators in response to motion for summary judgment). Plaintiff did not identify Riggins as a potential comparator at any stage of the GFT or EEO process. (Young Dep. at pp. 158-59, 163-66, Ex. 29, 31-33). Nor did Plaintiff mention Riggins during his deposition in this case. (See id. at pp. 179, 186-87, 196).

Defendant has produced evidence from the internal investigation of the alleged terminable offenses by Riggins. The report found that Riggins had made approximately a dozen deliveries of unauthorized hazardous materials over an eight-month period. (Evans Dep. at pp.

86, 88).  The findings also showed that Riggins more often than not passed off deliveries of radioactive materials to other couriers. (Id.).  Plaintiff does not dispute that Riggins was certified to deliver certain types of radioactive materials and that labeling inaccuracies by the senders of these packages often made the level of radioactivity in a particular parcel indeterminate. (Id. at p. 89).  Defendant therefore concluded that Riggins simply failed to differentiate the packages correctly on the instances he made unauthorized deliveries. (Id. at p. 88).  As such, Riggins's infractions were unintentional, which contrasts with Plaintiff's conscious choice to ignore the company delivery policy in favor of methods he preferred for his route.

Even if Riggins had deliberately failed to adhere to FedEx safety regulations, he cannot function as a proper comparator in this case.  Such safety violations would not require automatic dismissal.  This is in contrast to the delivery records Plaintiff falsified, any one of which required Defendant to terminate him under the zero-tolerance policy.


g. Phil Stefano

White courier Phil Stefano misdelivered a package in July 2005, but he had no intent to falsify the corresponding delivery record.  Stefano incorrectly entered into his personal electronic device at the time of delivery that the recipient had a signature authorization on file.  Plaintiff thus argues Stefano falsified a delivery record in the same manner as Plaintiff.  Aside from the lack of admissible summary judgment evidence in support of this claim, which appears to derive solely from multi-layered hearsay, the undisputed record reveals that Stefano had inadvertently delivered the package to the wrong address. (Britton Dec. at ¶ 16, Ex. 10; Connell Dep. at p. 39).  The person at that address, who was a neighbor of the intended recipient, did, in fact, have a signature authorization on file. (Id.).  Stefano therefore misdelivered the package by releasing it to the wrong address.  But he did not deliberately falsify the delivery record since he

merely mixed up the intended recipient, who had no signature release on file, with the actual recipient, who had authorized deliveries without a signature and lived at the location of the package's release.  Thus, Stefano is not similarly situated to Plaintiff.

### h. Tim Alexander

Plaintiff asserts that white courier Tim Alexander falsified delivery records when he entered the "package undeliverable" code for one of his deliveries on August 2, 2005.  Plaintiff provides no credible record evidence in support of this claim.  To the contrary, Defendant has produced evidence of a legitimate and reasonable explanation for Alexander's actions.  Because Alexander followed appropriate company procedures on August 2, he could not have falsified his delivery records and is not similarly situated to Plaintiff.

Much of Alexander's route requires using high-traffic loading docks at the Warner Robins Air Force Base. (Evans Dep. at pp. 92-93; Fritts Dec. at ¶ 9).  Often another vehicle already occupies a particular loading dock when the courier first attempts to make a delivery there. (Id.).  FedEx managers have testified that the courier should respond to this situation by entering the "package undeliverable" code into the personal electronic tracking device, just as Alexander did. (Id.).  This practice allows the electronic tracking record to reflect that "the customer is not available" at that point in time.  This is an acceptable use for the "package undeliverable" exception code. (Id.).  Thus, Alexander did not falsify his records.  He correctly responded to the congestion at this location by entering the appropriate exception code.  He cannot therefore function as a comparator.

<u>i. Russ Fritts</u>

Plaintiff last alleges that a white FedEx manager named Russ Fritts falsified company documents.  Not only was Fritts's conduct materially different from Plaintiff's, but Plaintiff also makes no showing that Fritts deliberately falsified any company document.  During the week of July 18, 2005, Fritts instructed all couriers at Macon Station to use a certain code when they had finished the daily package sorting routine. (Young Dec., Ex. 34).  Plaintiff suggests that this new code could have created an inaccurate impression of the actual completion time in company records. (Id.).  To the extent Plaintiff's claims on this point are largely based on unverifiable conjecture and unreliable hearsay, such evidence is inadmissible and cannot be considered on summary judgment.  Nevertheless, Plaintiff's claims could not create a genuine issue of material fact.

First, the undisputed record shows that Fritts's instructions directly reflected a policy change that the company had made and asked him and other managers to implement. (Sweat Dep. at pp. 145-47).  At most, Fritts may have inadequately communicated the purpose and significance of this policy change to the couriers at Defendant's Macon Station. (See id.).  Poorly communicating a new policy is not the same as intentionally falsifying a delivery record.

Second, Plaintiff has not presented adequate evidence from which this Court or a reasonable jury could conclude that the entry of this code amounted to an act of falsification.  Plaintiff has not even shown that the modified use of the sorting code did, in fact, mislead, confuse, or create any sort of false impression in company records.  After Plaintiff raised the issue, on the other hand, the record does reflect FedEx management's surprise that the policy change had confused anyone as well as evidence of Defendant's interest in addressing that newfound possibility. (See Young Dec. at Ex. 34).

Third, Fritts's conduct materially differs from Plaintiff's.  Fritts carried out a policy

change as directed by Defendant. His was required to implement the policy. Plaintiff frustrated company policy. He concluded on his own that by ignoring the signature release policy, he could make his deliveries easier, which he now suggests incidentally benefitted the company by making his route more efficient. Plaintiff knowingly put his job at risk by repeatedly falsifying delivery records. Fritts simply followed orders from above and thus is not similarly situated.

## II. Defendant had a legitimate, nondiscriminatory reason for firing Plaintiff on grounds he falsified delivery records, and Plaintiff cannot refute this reason as pretext for discrimination.

The Court need not consider Plaintiff's claims of pretext, having already determined that his prima facie case for discrimination fails as a matter of law. Nonetheless, Defendant's reason for firing Plaintiff on grounds that he falsified multiple company records qualifies as a legitimate, nondiscriminatory reason for his dismissal from FedEx. The undisputed evidence shows that a customer–not Defendant–caused Plaintiff's delivery practices to come under scrutiny, that Plaintiff had habitually pursued a course of misconduct, and that Plaintiff had express notice from several sources that each act of falsification constituted a terminable offense. Plaintiff cannot create a genuine issue of material fact merely by suggesting that the proffered reason for his dismissal was pretext for discrimination.

Management did not become aware of and act on Plaintiff's misconduct until after the company received an outside complaint from a customer. No reasonable jury could therefore conclude that Defendant initiated the process that led to Plaintiff's dismissal on the basis of race. Defendant had no control over the independent decision by one of the company's customers to complain about the level of service that customer received. The complaining customer had sent the package, which means this person had likely never met or dealt with Plaintiff and certainly would have had no reason to know his race.

The ensuing investigation of company records following this customer complaint revealed that Plaintiff falsified at least seventeen records in a single day. Defendant has pointed to record evidence that shows Plaintiff had i) attended a meeting on February 4, 2005, that announced the zero-tolerance falsification policy and its effect on the signature release policy; ii) received, reviewed, and understood a follow-up memo explicitly warning employees to stop falsifying delivery records or face immediate termination; iii) was present for a discussion with supervisors during which they warned all couriers about these policies; iv) listened to and acknowledged Evans's one-on-one reminders regarding important specifics of the falsification and signature release policies during the "Check Ride;" and v) referenced the employee handbook and other company materials detailing every aspect of these policies and the serious consequences of failing to adhere to them. Thus, Plaintiff had express knowledge of the nature and consequences of his actions.

Plaintiff, on the other hand, has pointed to no record evidence that could raise a fact question as to the authenticity or credibility of these delivery records. In fact, Plaintiff admits that he knew his behavior violated these policies. Though he claims his forbidden methods would benefit the company, he has shown no outward evidence of a good faith belief that the policy would actually benefit the company at large. The most he can show is that the liberties he took with company directives benefitted him personally by shortening his work day. Indeed, he actively concealed his inappropriate package releases by falsifying company delivery records. Instead of taking the opportunity to impress his supervisor during the "Check Ride" by revealing any potential business insight, Plaintiff cut his improper deliveries in half. At the least, these facts demonstrate that Plaintiff knew he was deviating from acceptable company practice and that he had elevated this self-serving behavior over any purported general desire to further Defendant's business interests.

Nor has Plaintiff cited anything in the record to indicate that management excepted him from these clear and universal directives or that his supervisors tacitly approved of his banned delivery practices. To the contrary, he acknowledges that at no point did any co-worker or manager at FedEx ever tell him that these policies did not apply to him. Without exception, the evidence in the record catalogues example after example of communications by Defendant to Plaintiff forbidding precisely the kind of misconduct Plaintiff deliberately continued to pursue after the zero-tolerance falsification policy took effect.

Courts in the Eleventh Circuit have repeatedly held that falsifying company documents is a legitimate, non-discriminatory basis for firing an employee. See Hampton v. City of South Miami, 186 F. App'x 967, 971 (11th Cir. 2006); Crawford v. Chao, 158 F. App'x 216, 218-19 (11th Cir. 2005); Geran v. McMillan, No. 1:06-cv-2506, 2008 WL 818321, at *7-8 (N.D. Ga. Mar. 25, 2008). As such, Plaintiff could not sustain his claims for discrimination even if he could establish a prima facie case because Defendant has shown a legitimate, nondiscriminatory reason for Plaintiff's dismissal.

Plaintiff has produced no evidence that Defendant's proffered explanation is pretext for discrimination. Assuming Plaintiff could make out a prima facie case of employment discrimination, which he cannot, Defendant's showing of a legitimate, nondiscriminatory reason for Plaintiff's dismissal would successfully shift the burden back to Plaintiff under the McDonnell-Douglas framework. 411 U.S. 792 (1973). Plaintiff's parade of potential comparators may succeed in spotlighting various forms of employee misconduct at FedEx, but these comparisons do nothing to lessen Plaintiff's own culpability, which is unrelated to his race.

Even if Plaintiff showed that his supervisors excepted him from these policies, which he attempts but fails to do, this fact would not absolve him from the consequences for his own misconduct; rather, it would merely implicate the offending managers as well in Plaintiff's

ongoing scheme to violate company policies. In any event, Plaintiff cannot show pretext by claiming that he was a good employee or that he exhibited good intentions in his behavior. See Rojas v. Florida, 285 F.3d 1339, 1342 (11th Cir. 2002) (advising lower courts to refrain from allowing plaintiffs to litigate whether they are, in fact, good employees).

Regardless, Plaintiff has not shown one instance of a similarly situated non-black employee receiving more favorable treatment for the same kind of misconduct. There is, however, undisputed evidence that Plaintiff's immediate supervisors, Evans and Britton, have fired white employees for acts of falsification. By its undisputed terms, the policy on falsification left no discretion in management for retaining an employee who had falsified company documents, so Plaintiff would necessarily have to show that a white employee was not fired for an act of falsification in order to create a genuine issue of material fact. Plaintiff cannot create a fact question simply by quarreling with the wisdom of Defendant's reasonable employment policies. Chapman v. A.I. Transport, 229 F.3d 1012, 1030 (11th Cir. 2000).

In upholding Plaintiff's termination, three levels of management concurred that he had falsified company delivery records. Plaintiff did not allege any discriminatory intent on the part of at least two of these reviewing managers. Absent evidence of racial bias in the appeals process at FedEx, the independent review by three-levels of managers who all upheld Plaintiff's dismissal would have removed the taint of any alleged discriminatory motive in Plaintiff's immediate supervisors. See Godby v. Marsh U.S.A., Inc., 346 F. App'x 491, 493 (11th Cir. 2009); Hanford v. The Geo Group, Inc., 345 F. App'x 399, 406 (11th Cir. 2009).

Notwithstanding the absence of any evidence of pretext, Plaintiff could not prevail on his claim because Defendant has demonstrated that the company made the decision to fire Plaintiff in the good faith belief that he falsified delivery records. Plaintiff has pointed to nothing in the record that might call into question the credibility of this determination. See Elrod v. Sears,

Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991) ("[F]or an employer to prevail, the jury need not determine that the employer was correct in its assessment of the employee's performance; it need only determine that the defendant in good faith believed plaintiff's performance to be unsatisfactory.") (internal citation omitted). In addition to failing to make out a prima facie case for Title VII or Section 1981 race discrimination, therefore, Plaintiff cannot show that Defendant's legitimate, nondiscriminatory reason for his discharge was pretextual.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment [Doc. 35] is **GRANTED**. The record evidence creates no genuine issues of material fact for trial. As a matter of law, therefore, Plaintiff's claims for race discrimination fail. The Clerk is directed to enter **JUDGMENT** in favor of Defendant as to all claims.

**SO ORDERED,** this 4th day of June, 2010.

_____

S/ C. Ashley Royal
C. ASHLEY ROYAL, JUDGE
UNITED STATES DISTRICT COURT

THC/chw/apg